Jones, Chief Judge,
delivered the opinion of the court:
This is a suit to recover loss and damages which plaintiff alleges were caused by the cancellation of a contract which defendant had made for the purchase of two' generators from the plaintiff.
Plaintiff learned through trade channels that defendant desired to purchase generators for use in connection with the Canol project in Alberta, Canada. Plaintiff, who was engaged in special engineering, sales, distribution, and manufacturing of electrical equipment, after some preliminary telegrams of inquiry, on September 8, 1943, sent to defendant’s representative in Edmonton, Alberta, Canada, the following telegram:
Ke phone order HDQ 2987. Have located Buda 468 Diesel ample capacity §0 KW 62.5 KYA set 1800 speed with overload generator on hand 120/208 Wye price 6,800 dollars. This engine trifle small for previously proposed 1,200 speed generator. Have located Buda 691 Diesel horsepower scant for 900 speed 75 KW 93.8 KYA stock 575 volt generator previously proposed with step down transformer for 120/208 wye but can rerate generator 65 KW 81 KYA to match engine capacity price 12,400 dollars. Also located Buda gasoline engine • of ample horsepower to operate same 75 KW 93.8 generator 900 speed full capacity with overload price 9,900 dollars. All prices U. S. dollars f. o. b. Newark, New Jersey, standard commercial type machines including certified factory tests. No U. S. engineer inspection tests or specifications to apply. Shipment 30 days AA-1. Telegraph instructions to avoid losing these engines.
On the same date defendant’s'representative sent plaintiff the following telegram in reply:
Keurtel 6 [sic] September referring purchase order HDQ 2987 44 bid accepted on 1 only 50 KW generator driven by Buda 468 Diesel complete with necessary controls at six thousand eight hundred dollars and 1 only 691 Buda Diesel driven generator 900 EPM with genera *117 tor rerated 65 KW to match engine capacity complete at twelve thousand four hundred dollars all FOB plant Newark, New Jersey. Confirming purchase order and AA-1 preference rating certificate will be forwarded promptly. Government blading will be furnished by district engineer office, New York District. Certified copies shop test acceptable.
Belying upon the telegram that confirming purchase order and AA-1 preference certificate would be furnished, plaintiff placed its written order for the two generator sets with Electric Arc, Inc., its subcontractor.
By letter of September 8, 1943, plaintiff submitted its' proposal for furnishing two Diesel-driven generator sets, confirming its telegraphic proposal.
By letter dated September 14, 1943, defendant forwarded to plaintiff at its principal office in Cleveland, Ohio, a contract order bearing date of September 7, 1943, with filled-in acceptance date of September 16, 1943. Delivery within thirty days was specified. The order contained certain provisions, the following being material to the present inquiry:
10. DELAYS — DAMAGES.;—If the Contractor re- . fuses or fails to perform this contract within the time specified, or any extension thereof, the Government may, by written notice, terminate the right of the Contractor to proceed with, deliveries or with such part or parts • thereof as to which there has been delay, and may hold the Contractor liable for any damage caused the Government by reason of such termination. The right of the Contractor to proceed with the performance of this contract shall not be terminated under this General Provision 10 if the delay is due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including without being limited to, any preference, priority, or allocation order issued by the Government or any other act of the Government.
11.. DISPUTES. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which, are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy, thereof to the Contractor. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision or that of his designated representative, rep *118 resentatives, or board shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
On October 5, 1948, the plaintiff accepted the contract.
The purchase order did not require the contractor to give the Government any notice of delay, nor was there any penalty provision calling for the payment of liquidated damages, which are usual conditions in standard Government contracts. The evidence shows that generator sets such as called for by the contract were difficult to obtain.
Manufacturers and suppliers were subject to defendant’s allocation and priority system. The top priority symbol was known as AAA. Below this rating were classifications known as AA-1, AA-2, etc. It was required that preference be given to the higher rating and where two orders were of the same rating the allocations were usually in the order of the respective dates of the contracts.
The details are set out in the findings and will not be repeated here.
The subcontractor operated its plant seven days a week from 8 a. m. to 9:30 p. m., except on Fridays the work terminated at 5 p. m., and on Saturdays and Sundays at 4:30 p. m.
It is manifest that the shortage of materials and the priority system caused the delay in the delivery of the generators. A change in priority from AA-1 to AAA on an order given by the Coast Guard, which was being filled at the same time, caused further delay. There were also other orders given by the defendant to plaintiff and the subcontractor for other generators and electrical equipment.
A dispute arose as to certain additional equipment, the plaintiff contending that its contract did not call for the extra equipment and the defendant claiming that plaintiff was not providing a circuit breaker, frequency meter, tachometer, housing, switch panel, safety shutoff, or fuel tanks. The plaintiff agreed to furnish a circuit breaker and switch panel. It also indicated a willingness to furnish the other items, provided they were classified as extras and paid for on tha1 basis.
*119 On November 24, 1943, defendant’s procurement officer, Gordon T. White, advised plaintiff by telephone that its contract was being cancelled because plaintiff had failed to deliver the two units within the period specified by the contract. Plaintiff protested vigorously, but the procurement officer insisted that the contract was being cancelled.
Notice of cancellation was confirmed on the same date by telegram to plaintiff signed by the division engineer at Edmonton, but sent by the contracting officer. Plaintiff replied by telegram dated November 27, 1943, requesting postponement of formal documentation until factual basis of cancellation could be established, and calling attention to Clause 10 of the contract, and again, offering to supply the extras as extras and advising that the machines were ready for shipment according to contract and quotations.. No action was taken by the contracting officer upon plaintiff’s protest.
According to the usage of the trade suppliers dealing in electric generators understand the term “standard type of commercial machines” to include a base, generator and engine coupled together, necessary carburetor, spark plugs (when gasoline powered), a governor and voltage regulator. For a machine of this size a fuel tank was not normally supplied. Low water and oil automatic controls and the other items would be considered as extras and put on when ordered as such. A voltage regulator and the governor were supplied by the plaintiff. The evidence indicates that the machines as prepared by the supplier, the subcontractor in the instant case, would meet the requirements of the specifications.
The contracting officer testified that he did not know of plaintiff’s protest, but he nevertheless directed the cancellation on the recommendation of the procurement officer. . He further testified that he did not see the plaintiff’s telegram protesting cancellation; that it was not brought to his attention, as contracting officer, and that he took no action on it; that he was never requested to make any findings of fact, and remembered no letter from plaintiff asking for findings of fact. He also testified that he didn’t remember any letter from the Secretary of War asking him to make such findings.
On November 30, 1943, the contracting officer by letter submitted for execution by the plaintiff a supplemental *120 agreement dated November 24, 1943, reading in- part as follows: .
Whereas, it is found advantageous and in the best interests of the United States to cancel said contract for the default of the Contractor, since he failed to deliver within the time specified as set forth in the Contract and the Government was forced to procure the.material from another source; and
Whereas, it has been determined that the execution of this Supplemental Agreement will facilitate the prosecution of the War; and
Whereas, this Supplemental Agreement is executed pursuant to the First War Powers Act, 1941, and Executive Order No. 9001, dated 27 December 1941;
Now, Therefore, Contract No. W-3416-Eng-1084 (Purchase Order No. HDQ-2987-44) is hereby cancelled in its entirety as of the date and year first above written.
Naturally the plaintiff returned the proposed supplemental agreement unsigned. Anyone who had ever traveled as far as the rim of his own neighborhood wouldn’t have signed such a confession. In returning the unsigned agreement plaintiff again protested the cancellation and cited paragraph 10 of the contract, claiming that delay in delivery of the two generators was due to prior preference work on the 54 generators supplied by it under earlier orders.
The contracting officer made no reply to plaintiff’s letter and made no further effort to obtain plaintiff’s consent to the cancellation.
No shipping directions were issued to plaintiff and neither of the generators nor parts or materials therefor were transferred to the Government, nor does the evidence show that defendant purchased the generators elsewhere. No authorization was issued by the contracting officer for the disposal of the generators or parts. No findings of fact on the dis-' puted issue were made by the contracting officer.
■ On January 26,1944, plaintiff’s counsel wrote the Secretary of War in part as follows:
The contract makes no provision for appeal to you as Head of the Department in the event of termination. Since, however, it is the view of .the contractor that the contracting officer has not acted in terminating the contract and the action of the Commanding General is null *121 and void and The United States has breached the terms of the contract and has exposed itself to an action for all damages incurred by the contractor and its subcontractors, it is believed proper that the facts of this case be brought to your attention for such action as you may deem proper.
On February 4, 1944, Colonel Miles Eeber, General Staff Corps, Chief, Contract Termination Branch, Beadjustment Division, advised plaintiff’s counsel as follows:
* ‡ ‡ $ ❖
Since this contract is under the jurisdiction of the Chief of Engineers, this office has requested a full report on the subject from him. Immediately upon receipt of his reply, I shall be glad to advise you further.
On June 1,1944, Colonel W. H. Draper, Jr., General Staff Corps, Chief, Contract Termination Branch, advised plaintiff’s counsel further:
* * * * *
It appears from your letter and from the report of the Corps of Engineers, that a dispute exists as to whether the delay of the contractor was “due to unforeseeable causes beyond the control and without the fault or negligence of the contractor.” Under these circumstances the contract (paragraph 11) provides that the dispute shall be determined by the contracting officer, from whose decision in writing the contractor may appeal to the Secretary of War within thirty days. This is the present procedure for the disposition of disputes between the War Department and its contractors and is applicable in this case.
It also appears that a proposed supplemental agreement was sent to Universal Power Corporation by the contracting officer on 24 November 1943, for the signature of the contractor, and that this proposed agreement contained certain determinations of fact by the contracting officer. Whether this action constituted a “decision in writing” is a question which may have to be decided on appeal, and this office must necessarily refrain from expressing any opinion on this issue or taking any action which might affect it in any way.
It is understood that the Corps of Engineers through its contracting officer will shortly mail to the contractor a “decision in writing” on the disputed facts (without waiving any legal rights which the Government may have already acquired if the proposed agreement *122 constituted a “decision in writing”).' If the contractor elects to appeal from this decision, the appeal will bring . before the War Department Board of Contract Appeals (acting as the representative of the Secretary of War) for decision: (1) Whether the, Board should take jurisdiction of the case; and (2). if jurisdiction of the case is taken, the various matters in dispute.
On June 8,1944, plaintiff’s counsel responded to the effect that suit would be withheld in the hope of an .amicable settlement, but again protesting the cancellation. Colonel Draper replied on June 7, saying that it was not the policy of the War Department in cases of default to reimburse contractors for losses which they may have sustained, and that the question of whether the Universal Power' contract was a proper case for default depended upon whether the delay was “due to unforeseeable causes beyond the control and without the fault or negligence of the contractor,” and that that, of course, was a disputed question of fact.
Plaintiff was furnished no findings of fact by the contracting officer in accordance with the advice received from the Secretary of War, nor was it otherwise advised of any further action taken by the War Department.
There was no dispute about whether there was a delay. A glance at the calendar showed that. Both parties .admitted it. The dispute was as to the cause of the delay. This issue was never decided by the contracting officer, though such a decision was repeatedly requested. Whether the criticism of the project and the practical .abandonment of it caused cancellations generally is not disclosed by the testimony. At any rate, when the issue was raised as to whether the priorities and allocations caused the delay it was the duty of the contracting officer to decide it. Instead he sidestepped the issue.
Considering the testimony as a whole, we find that the delays were caused by the priority and allocation orders issued by the Government.
Plaintiff had agreed to pay its subcontractor $15,500 for the two units, leaving a margin of $3,700 to cover its overhead expense and profit in its contract price of $19,200.
Plaintiff’s subcontractor threatened to bring suit against the plaintiff for the price of the materials, $15,500, and other *123 damages including storage, drayage, etc. Plaintiff advised the defendant that to minimize the damages it would be forced to sell the two generators at the best price .obtainable. Defendant offered no objection to this procedure. A sale was consummated for the sum of $13,450, the best price obtainable since these generators were not stock sets,- but had been assembled for a particular purpose.
The subcontractor suffered a loss of $2,050, plus other items of expense that are not clearly shown. Plaintiff, settled these claims for $1,000 by paying the subcontractor that amount.
Plaintiff sustained a loss of $1,000 through the disposition of the two generators and settlement with its subcontractor, and $3,700 in overhead and profit under its contract with the defendant, or an aggregate sum of $4,700.. No claim is made for any loss to plaintiff’s subcontractor.
Since the delay was caused by the operation of the priority and allocation system, the defendant, in view of the provisions of article 10, is liable for the loss and damages.
In the circumstances the plaintiff is entitled to recover of the defendant the sum of $4,700. It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.